EDWARDS, Judge.
This is an action on a life insurance policy issued in connection with a loan made by Eddie R. Pendarvis with Guaranty Bank and Trust Company of Zachary. The policy was issued in March, 1973, and Pendarvis died of acute myocardial infarction in June, 1973. Defendant-insurer refused payment of the proceeds and returned the premium, claiming that Pendarvis knowingly made false and material misrepresentations in the policy application. The trial court ruled in favor of the insurer, and plaintiffs (Guaranty Bank and Pendarvis’ widow, as their interests appear) now take this appeal.
FACTS
In order to purchase a cycle shop in Clinton, Louisiana, Pendarvis applied for a loan at Guaranty Bank. The bank required credit life insurance, which Pendarvis obtained through Continental Service Life and Health Insurance Company. In connection with the application, Pendarvis was examined by Dr. R. K. Munson of Clinton. Pertinent are the following questions from Part Two of the application asked of Pen-darvis by Dr. Munson:
No. 2 — Have you ever had or been told you had high or low blood pressure or disease of the heart or circulatory system?
No. 13 — Do you or have you ever been advised to have surgical operation, x-ray or radium treatments, blood test, x-ray electrocardiograph, or Basal metabolism?
No. 16 — Are you in good health and free from impairment?
No. 17 — When were you attended by a physician or practitioner? Details?
Pendarvis answered “No” to questions 2 and 13 and “Yes” to question 16. He answered to question 17 that he was treated in 1971 for obesity by the examiner, Dr. Munson.
The record discloses the following additional information concerning Pendarvis’ medical history:
In November, 1971 he saw Dr. Toler; his complaints were that he was overweight and suffering pain in the chest. Several tests were run, including an electrocardiogram (EKG). Dr. Toler prescribed a 1500 calorie diet.
In December, 1972, Pendarvis saw Dr. John Piker, who practiced with Dr. Toler, and related complaints of shortness of breath and pain in the chest. Dr. Piker had an EKG taken on him. He testified that he compared this EKG with the earlier one taken by Dr. Toler and found marked changes: the earlier was suggestive of myocardial disease while the later was inconclusive. Dr. Piker was certain that he discussed with Pendarvis these EKG’s and that he mentioned to him that there were changes apparent therein. He did not, however, indicate to Pendarvis whether one was better than the other. Further, he told Pendarvis that, if his complaints persisted, he needed to consult a cardiologist. Finally, Dr. Piker prescribed for Pendarvis Ni-tro-Bed and nitroglycerine capsules, the former to be taken twice a day, the latter as needed for pain.
Lula Lagrove, the pharmacist at the Clinton Infirmary, testified that, between December 7, 1972 (the date these prescriptions were filled) and May 14, 1973, Pendarvis obtained refills for the Nitro-Bed ten times and for the nitroglycerine three times. The Nitro-Bed prescription called for 60 capsules; the nitroglycerine, 100.
LAW:
Continental’s defense is based on LSA-RS 22:619(B), which provides:
“B. In any application for life or health and accident insurance made in writing by the insured, all statements therein made by the insured shall, in the absence of fraud, be deemed representations and not warranties. The falsity of any such statement shall not bar the right to recovery under the contract unless such false statement was made with actual intent to deceive or unless it materially affected either the acceptance of the risk or the hazard assumed by the *369 insurer. Amended and reenacted Acts 1958, No. 125.”
In Gay v. United Benefit Life Insurance Co., 233 La. 226, 96 So.2d 497 (1957) our Supreme Court interpreted this provision to mean that a material misrepresentation by an insured will not defeat recovery of policy proceeds unless such misstatement was made fraudulently or with the intent to deceive; that is, knowing it to be untrue and believing it to be material to the risk (or of such a nature that it would be only reasonable to assume that he must have believed that it was material).
Therefore, the burden is on the defendant-insurer to show that the misrepresentations were material to the risk and made with an intent to deceive. Knight v. Jefferson Standard Life Insurance Co., 205 So.2d 485 (La.App. 1st Cir. 1967).
As Pendarvis’ medical history discloses, the answers given to the four questions of Part Two of the application were false. Further, the medical director for Continental testified that had he known of the medication Pendarvis was taking he would have rejected the application and had he known of the EKG’s, he would have requested them and investigated further. The fair inference is that a true answer to any of the four questions would have disclosed Pendarvis’ heart condition and prompted rejection of his application; therefore, the misstatements were also material.
We turn now to the third requirement, the intent to deceive. Two questions are presented: (1) Did Pendarvis know his answers to be untrue? (2) Were the questions and answers of such a nature that we can reasonably assume that Pendarvis believed them material?
Unquestionably Pendarvis knew his answer to No. 17 was false; he had seen Dr. Piker twice only three months earlier, yet failed to mention that consultation or the visit to Dr. Toler in December, 1971. Whether his answer to No. 13 was consciously false depends on whether he knew that two EKG's had been run on him. Dr. Piker testified that he discussed both EKG’s with Pendarvis. Also, Dr. Munson, Pendar-vis’ family physician, who conducted the insurance examination and asked Pendarvis the questions, opined that Pendarvis could have understood medical terms. He further stated that he thought the average individual would know what an EKG was if he had one run on him relative to Pendar-vis’ educational background, the record reflects that he was a high school graduate, that he was trained in refrigeration, experienced and knowledgable in plumbing and electrical work, and active in business affairs. Considering all of this, we believe Pendarvis must have been aware that EKG tests had been performed on him and, therefore, that his answers were false.
Granted that the answers were false, can we reasonably assume that they were of such a nature that Pendarvis must have believed them material? Although there is some testimony in the record that Pendar-vis may have believed his pain and shortness of breath to be caused by arthritis and obesity (and, if so, could have considered the EKG’s and visits to Drs. Toler and Piker immaterial), the majority of the evidence indicates that Pendarvis must have known that he was suffering some degree of heart disease. Dr. Piker discussed the EKG’s with Pendarvis in December of 1972 and told him that there were changes. He further prescribed medication and warned Pendarvis that, if his problems persisted, he should see a cardiologist. Evidently the problems continued, for Pendarvis renewed the prescriptions several times in a three-month period. Knowing at least all of this, Pendarvis surely must have believed the information withheld was material to the acceptance of the risk of insuring his life.
The decision of the trial court is affirmed at appellant’s cost.
AFFIRMED.