EDWARDS, Judge,
dissenting.
I dissent from the opinion and holding of the majority because I believe that the Travelers policy afforded coverage in this instance.
The critical issues presented are: 1) whether or not Janice Batiste, who applied for the policy, gave false statements to the insurance agent; 2) whether or not the false statements (if any) were made with an intent to deceive and were material to the risk assumed; 3) whether or not Janice possessed an insurable interest; and 4) whether or not Janice gave Shedrick Keys permission to use the insured vehicle so as to afford coverage to the “second permit-tee” driver of the vehicle under the omnibus insured clause of the policy. I would respond in the negative to the first two issues and in the affirmative to the latter two issues.
MISREPRESENTATIONS
The majority quotes approvingly the trial judge’s Reasons for Judgment in which the trial judge stated:
“ . . .At the time that she (Janice Batiste) applied for the liability insurance she gave the impression to the insurance agent that she was married to Mr. Keys. He wrote the policy on the basis that she would be driving the car and that no one else would be driving the automobile. The agent testified that he did not know of Mr. Keys. The court finds from the evidence there was such a material misrepresentation on the part of Mrs. Batiste that the insurance policy issued by Travelers Insurance Company is null and void and therefore has no coverage on the Keys vehicle or his driver.”
Admittedly, such a holding is based upon an evaluation of the credibility of the various witnesses, and is afforded great weight on review so that the appellate court should not disturb the trial court’s factual findings in the absence of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973). The conclusions of the trial court with respect to the false statements attributed to Janice in this case present, in my opinion, such an instance of manifest error.
Three persons were present when Janice applied for the liability insurance, namely Janice, her sister Phyllis Penn, and the insurance agent, Tom Sheppard. Two of these individuals,[1] Janice and Sheppard, testified at trial, with each giving contradictory accounts concerning the statements and information given by Janice for the insurance policy.
*878 Janice maintains that she informed the agent that: she was married to Batiste, but legally separated; she was living with Keys; the car was registered in Keys’ name; Keys was driving the car; and she would be using the car to go to and from work. Janice testified that she neither filled out the application nor did she sign the application.
Sheppard, the agent, testified that he was the one who filled out the information on the application. He further testified that he was “led to believe” that Janice was married to Keys, but legally separated.
The following is the pertinent testimony given by Sheppard regarding the misrepresentations:
Direct examination at TR p. 182 et seq.
Q. Who was the named insured on the policy, Mr. Sheppard?
A. Mrs. Shedrick J. Keys.
Q. Do you recall the time that Mrs. — the woman who purported to be Mrs. Keys came to your office, when she came to your office and applied for the policy?
A. I do.
Q. Tell me what the circumstances were surrounding the filling out of the application.
A. Well, the way it was presented to me at the time, that the owner of the vehicle was Mrs. Shedrick Keys.
Q. Mrs. Shedrick Keys was the owner?
A. And used the car to go to work, you know, some five or six miles to work.
Q. Did she indicate to you that she owned the car?
A. Yes, she presented herself for insurance on the car.
Q. Did she tell you whether or not she was married to a Shedrick Keys or whether she was living with a man named Shedrick Keys or whether she was separated—
MR. GEMEINHARDT:
Your Honor, I object to the leading questions. I think this is counsel’s witness and I believe that he should be re-directed.
THE COURT:
Don’t lead, Mr. Watts.
EXAMINATION BY MR. WATTS.
Q. What did she tell you about her marital status, Mr. Sheppard?
A. The figuring of the premium for the automobile was based on a married lady. When I asked — for a married lady, not — with no male, no male drivers, no males in contention, there’s a different rate, as there would be on an eighteen year old male, whether he be married or not. Then when I asked Mrs. Keys — Mrs. Batiste for her driver’s license number, which is customary to get the date of birth and the driver’s license number off of it, it had Janice E. Batiste.
As so often happens a lot of time with young people, they are married and have not had the time to change it to the married name, you know, from the driver’s license. I asked her where is, like, Shedrick Keys or the male in this and she said that she was separated.
Q. She told you that?
A. She told me they was separated. So, as far as I was concerned, I thought her name was Janice Edgerson Batiste Keys.
Now, I don’t know if I can add this. I knew Miss Batiste, you know, her grandfather Edgerson had died, and Leon, his son, and several members of the Edgerson family.
* * * * * *
Cross examination by Mr. Gemeinhardt at TR p. 200 et seq.
Q. Did you ask, since you were so familiar with the Edgerson family and you knew—
A. I knew of them, sir.
Q. All rights, sir. You knew that she was Janet Edgerson; who did you think Janet Edgerson Batiste was?
A. I had no idea.
Q. Didn’t you believe that Janet Edger-son was separated from Batiste?
*879 A. Her mother could have been an Edg-erson and married a Batiste and her name could be Janet Edgerson Batiste and when she married, she was a Keys. That’s what I thought.
Q. In other words, you could have thought the Batiste, though, couldn’t you, that Janice Batiste, Janet Edg-erson was married to Batiste and she was separated from Batiste?
A. If the name of the insurance would have requested the name of the Mrs. Shedrick Keys. I wouldn’t have thought of Batiste if the name insured is to be Mrs. Shedrick Keys. As I explained before, so often happens with young people, they get married and you have up to two years to change your driver’s license.
Q. You’re taking the application, sir, and you’re asking whether she’s separated and you have her name to be Janice Batiste, yet you knew she was an Edgerson, so what I’m saying, isn’t it fair for you to have believed that Janice Edgerson was separated from Batiste and that Batiste was the man—
A. I didn’t find this out until after all of it happened, sir.
Q. You found that out later; she didn’t misrepresent to you that she was not married to — that she wasn’t married to Jan — to Batiste, did she?
A. That she wasn’t married to — I didn’t even know who Batiste was.
Q. Why didn’t you ask her?
A. For the simple reason I didn’t think it was relevant.
Q. You found out the lady was separated and you knew she was an Edger-son?
A. And she was purportedly married to Keys, John Batiste Keys.
* * * * * *
Q. I’m asking you when you wrote down that the lady was separated, wouldn’t it be fair for you to conclude or for her to conclude that she was saying that she was separated from a man by the name of Batiste, particularly since she was a Janet Edgerson?
A. It never so occurred to me, sir, because if you’re separated from a Batiste, how can you be a Mrs. Keys and buy an automobile policy?
Q. All right.
A. I mean, along that line of reasoning, if you’re separated from Batiste, then you can not buy — you’re not a Mrs. Keys. I mean, you know, my mind does not work that way.
It’s sort of Monday morning, I think, you’re asking me the question; it’s not Saturday afternoon.
Q. I don’t see in the application you prepared that she states she was separated from Keys.
Do you see that on the application that she says she was separated from Keys?
A. She told me that she was separated, sir.
* * * * * *
Q. The application that you prepared does not state that Janice misrepresented to you that she was separated from Keys, does it?
A. It says she was legally separated.
Q. But it doesn’t say she was legally separated from Keys?
A. It does not say from whom, no, sir.
Q. As far as you know, you didn’t ask her specifically whether she was separated from Keys or whether she was separated from Batiste?
A. I couldn’t have asked her if she was separated from Batiste. I didn’t even know she was married to him. I thought she was married to Keys and I thought she was separated from Keys.
* * * * *
Re-direct examination by Mr. Watts at TR p. 210 et seq.
Q. Were you led to believe this lady was married to Shedrick Keys?
A. Yes, sir.
*880 Q. Did you have any reason to believe she was not married to Shedrick Keys?
A. No, sir.
While the above testimony (comprised as it is of inferences and assumptions reached by the agent) might be accepted as conflicting with Janice’s straightforward testimony regarding her marital status, it does not in any sense dispute Janice’s testimony that she told Sheppard that Keys would be driving the car.
In the final analysis, the sole relevant allegation of falsehood is that Janice misrepresented that she alone would be driving the car. There is nothing in the record to contradict Janice’s testimony that Keys, as well, would be driving the car.
Indeed, the application itself provides an opportunity to inquire with regard to others who will drive the insured vehicle under item No. 6, “We Need to Know These Things About People Living In Your Household (including students and military personnel) Who Operate Any Vehicle.” The only listing made by the agent who filled out the application was “Janice Batiste E. Keys.” Had the agent written “no others” or “none”, it would have indicated that he had asked her this question. However, from the record, I cannot find that this question was ever asked of Janice. The record indicates that the agent listed no other drivers, a fact he assumed because the woman was legally separated. Under the rule stated in Fruge v. Woodmen of World Life Insurance Society, 170 So.2d 539 (La.App. 3rd Cir. 1965), this error is binding on the insurer and does not bind the insured.
Consequently, I find that the trial court’s holding that Janice had made material misrepresentations is manifestly erroneous.
Additionally, I do not find that the insurance company has satisfied its burden of proving an intent to deceive. LSA-R.S. 22:619.
In Gay v. United Benefit Life Insurance Co. 233 La. 226, 96 So.2d 497 (1957), our Supreme Court stated that a material misrepresentation by an insured will not defeat coverage unless such misstatement was made fraudulently or with intent to deceive. To avoid liability based on misrepresentations, a defendant-insurer must show, both, that the misrepresentations were material to the risk and that they were made with an intent to deceive. Brown v. National Old LIfe Ins. Co., 345 So.2d 1023 (La.App. 2nd Cir. 1977); Pendarvis v. Continental Service Life and Health Ins. Co., 339 So.2d 367 (La.App. 1st Cir. 1976); Reed v. American Casualty Company, 317 So.2d 648 (La.App. 1st Cir. 1975); and Knight v. Jefferson Standard Life Ins. Co., 205 So.2d 485 (La.App. 1st Cir. 1967).
Travelers has not met its burden of proving an intent to deceive. The information required by an insurance company to process an application is not always apparent to a layman. I do not believe that an intent to deceive has been shown in this case or can be inferred from the evidence in the record.
I would hold that the policy was valid and enforceable.
INSURABLE INTEREST
The general rule with regard to insurance policies is that a person obtaining a policy of insurance must possess an “insurable interest” in the subject matter of the insurance, otherwise the policy is unenforceable. LSA-R.S. 22:614(A). The term “insurable interest” is defined in LSA-R.S. 22:614(B) as “any lawful and substantial economic interest in the safety or preservation of the subject of the insurance free from loss, destruction, or pecuniary damage.”
The mere fact that the title to the car and the registration were in Keys’ name is not conclusive on the question of Janice’s insurable interest in the car.
The record reveals: that Janice supplied the $600 down payment for the car; that this down payment was not a loan from Janice to Keys, and that Keys did not repay the $600 to Janice; that both Janice and Keys paid the installment notes to GMAC; and, even after Janice and Keys split up, they both continued to pay the car notes and both shared the use of the car.
*881 Such evidence, I believe, overwhelmingly preponderates in favor of the conclusion that Janice was a co-owner of the car and, as such, had an insurable interest within the context of LSA-R.S. 22:614(B) to procure liability insurance. Consequently, the policy was enforceable.
PERSONS INSURED
At the time of the accident, Keys had possession and use of the ear, had permitted Michael Page to drive the car, and was a passenger in the car in the front seat.
The specific question, then, is whether the omnibus clause of the Travelers policy provided coverage for Michael Page in the circumstances. The pertinent clause in the policy provided in part:
“Each of the following is an insured under Part I;
(a) With respect to the owned automobile,
(2) any other person using such automobile with the permission of the named insured, provided his actual operation or (if he is not operating) his other actual use thereof is within the scope of such permission . . ”
The application of this clause should be in harmony with the strong legislative policy provided in LSA-R.S. 22:655, which states in pertinent part:
“It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all insured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy.” (emphasis supplied).
Janice testified that she and Keys were sharing the use of the car and, at the time of the accident, that she was using the car during the week to go to and from work and Keys was driving the car on the weekends. Keys testified similarly.
Under these circumstances and in view of the nature of the relationship between Janice and Keys (cohabitation and co-ownership of the car), the conclusion is inescapable that Janice gave Keys permission to use the car at the time of the accident. This permission contained no restrictions since, in truth and in fact, the permission was for Keys to use the car as his own. The permission was of the broadest possible scope (i. e. co-ownership) and included the possibility that Keys might allow someone else to drive the car. See Hurdle v. State Farm Mutual Automobile Insurance Co., 135 So.2d 63 (La.App. 2d Cir. 1961).
Therefore, the Travelers policy afforded coverage to the second permittee, Michael Page, in the instant case. Hughes v. Southeastern Fidelity Insurance Co., 340 So.2d 293 (La.1976). Compare American Home Assurance Co. v. Czarniecki, 255 La. 251, 230 So.2d 253 (1969).
I would reverse the judgment of the trial court and render judgment against Travelers on the policy.

. Phyllis Penn was hospitalized at the time of trial and did not testify.
Counsel for both sides stipulated that “if she were called, she would testify to the same words that Mrs. Batiste testified to.”